HARRISON v. HUGHES et al.

(Circuit Court of Appeals, Third Circuit. September 1, 1903.)

No. 38.

1. NAVIGABLE WATERS—OBSTRUCTION BY UNFINISHED BREAKWATER—DUTY OF CONTRACTOR TO MAINTAIN LIGHTS.

Contractors with the United States for the construction of a breakwater near the mouth of Delaware Bay, who were required by the contract to erect and maintain at their own expense a stake light at the end of the new structure while the work was in progress, in accordance with the instructions of the engineer officer in charge, or his agent, and also such other lights as the engineer might direct, were bound not only to maintain lanterns in the required positions, but also to see that they were kept trimmed and brightly burning during the hours of darkness, and they are liable for injury to a vessel stranded on the new construction by reason of the extinguishment by the wind of the stake light, where they had knowledge that it was liable to be so extinguished, and had been a number of times previously.

2. SAME—CONSTRUCTION OF CONTRACT.

The provision of the contract requiring them to maintain such other lights as the engineer should direct did not necessarily measure their obligations to third persons to whom they owed the duty of maintaining such lights as were necessary or proper in view of the dangerous character of the structure, whether directed by the engineer or not.

3. SAME—ACT OF GOD.

The extinguishment of the stake light by the wind due to its improper adjustment cannot be attributed to the act of God or vis major, so as to relieve the contractors from liability, being something which might reasonably have been anticipated, and could have been guarded against in the exercise of reasonable care and vigilance.

4. SAME—CARE REQUIRED OF CONTRACTOR.

Reasonable care and vigilance required the contractors to guard against the probable consequences of the extinguishment of the light or its failure to burn at night, and, if it was impracticable to properly relight the lantern whenever the light was blown out in a storm or high wind, they should, in view of the great danger to navigation resulting from darkness at that point, either have erected an electric light which could have been operated from the shore, or made such disposition of their floating plant as to warn vessels away from the new breakwater.

5. PILOTS—QUALIFICATIONS—CARE AND SKILL REQUIRED.

Pilots whose vocation is to control the course of vessels into and out of Delaware Bay and River and their anchorage therein, are required to exercise the care and skill of river and harbor pilots, and are chargeable with knowledge of natural objects on shore and the obstacles to navigation, and of the significance of fixed and permanent lights.

**6.** ADMIRALTY—FAULTS ATTRIBUTABLE TO VESSEL—NEGLIGENCE OF COMPULSORY PILOT.

By the American admiralty law, the fault or negligence causing a collision with another vessel or a structure is imputable to the vessel, although it was that of a compulsory pilot.

**7.** NAVIGABLE WATERS—INJURIES FROM OBSTRUCTION—CONTRIBUTORY FAULT OF VESSEL.

The injury of a steamship by running into a partly constructed breakwater in Delaware Bay in the night *held* due in part to the fault of the contractors in failing to maintain lights and in part to the negligent navigation of the vessel by the pilot, which precluded her from recovering full damages.

Appeal from the District Court of the United States for the District of Delaware.

For opinion below, see 110 Fed. 545.

John F. Lewis, for appellant.

H. G. Ward, for appellees.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. A careful review of the testimony, as disclosed in the record in this case, convinces us that the decree of the court below should be affirmed. The opinion of the learned judge of that court so entirely, and satisfactorily to us, covers all the points in controversy, that we adopt the same as the opinion of this court. It is as follows:

"The libel in this case is in personam and was filed by Albert Harrison, master of the British steamship Glenochil, against Eugene Hughes, James Hughes, Charles Hughes and Ansom Bangs, trading as Hughes Bros. & Bangs, to recover damages for injuries sustained by that vessel through running upon the new breakwater off Lewes, near the mouth of Delaware Bay, about 1 o'clock in the morning of November 30, 1897. At the time of the accident the new breakwater, extension to the breakwater, or harbor of refuge, as it is indifferently termed, was in course of construction by the defendants, under a contract between Major C. W. Raymond of the corps of engineers of the United States Army, acting for and in behalf of the United States, as party of the first part, and the defendants as parties of the second part. The contract was in writing, bore date February 5, 1897, was approved by the chief of engineers February 20, 1897, and provided among other things as follows:

" 'The said Hughes Brothers and Bangs shall furnish the necessary plant and material and do all the work required for the construction of a stone breakwater in Delaware Bay, Delaware, in strict accordance with, and subject to all the conditions and requirements of the specifications hereunto attached and forming a part of this agreement.'

"Among the conditions and specifications are the following:

" '(3) Maps of the localities may be seen at this office. Bidders, or their authorized agents, are expected to visit the place and to make their own estimates of the facilities and difficulties attending the execution of the work, including the uncertainty of weather and all other contingencies.'

" '(42) Description of the Locality. The site of the proposed breakwater is about 2¼ miles north of the Delaware Breakwater Harbor, about 3 miles from the Government Pier at Lewes, Delaware, and about 10 miles from Cape May. * * *'

" '(56) * * * The work shall be conducted in strict accordance with instructions given from time to time by the engineer officer in charge. * * * All operations connected with the work will be under the immediate supervision of assistant engineers, inspectors or other agents of the engineer officer in charge, and their instructions shall be strictly observed by the contractor and his employees.'

" '(59) The work will be commenced by the construction of the substructure at the upper or northwest end of the breakwater, where the mound will be raised to the level of mean low water as rapidly as possible, and over a length at mean low water at least 100 feet. Upon this mound a stake light will be erected, which must be thoroughly protected from ice and storms by depositing very large stones around it. This light will be erected and protected in accordance with the instructions of the engineer officer in charge, or his agent, and it will be maintained by the contractor as long as required by the engineer officer in charge.'

" '(62) Plant. The plant shall be adapted to the work and shall be kept in good condition at all times.'

" '(65) Lights. During the progress of the work, the contractor must keep suitable lights, every night from sunset to sunrise, upon all his vessels at or in the vicinity of the work. He must also maintain on the work such lights as the engineer officer in charge may direct. These lights will be mantained at the expense of the contractor. The United States will not be responsible for any accident that may occur to the contractor's plant, to passing vessels, or to any property whatever during the progress of the work.'

" '(70) Bidders shall further state, on the form hereto appended, and in accordance with the directions thereon, whether they are now or ever have been engaged on any contract or other work similar to that which is proposed, giving the nature and location of the work, the year or years in which it was done, the manner of its execution, and such other information as will tend to show their ability to vigorously and successfully prosecute the work required by these specifications. Any bid not complying with these instructions will be rejected.'

"The defendants in their proposal for the work, dated November 24, 1896, among other things said:

" 'We are now engaged in constructing a stone breakwater at Point Judith, R. I., and a stone breakwater, also at entrance at harbor at New Haven, Conn. Both for the U. S. Government. * * * We make this proposal with a full knowledge of the work. * * *'

"On or about May 3, 1897, work was commenced on the new breakwater and about the same time a stake light was placed on a mound or stone pile constituting its northwesterly end. On the night of the accident the breakwater had been partially constructed for a distance of about 1,925 feet at low water extending from the end provided with the stake light southeastwardly; no other light having been provided for the work prior to that time. The libel, among other things, contains the following averment:

" 'That the stranding of the said steamship upon the new breakwater as aforesaid was caused by the carelessness, negligence and recklessness of the said respondents, in that the said new breakwater so under construction by said respondents, as contractors as aforesaid was at and before the time of the said stranding of said steamship, entirely without lights to mark its position and was, at its then stage of construction, thereby rendered a dangerous obstruction to navigation, which said absence of lights and dangerous obstructions were at the time known, or with proper diligence ought to have been known to the said respondents.'

"It is admitted that at the time of the accident the stake light was not burning. The fact that it was not then burning undoubtedly caused or contributed to the disaster. There is, indeed, a conflict of evidence on the question whether the lantern was at that time attached to the stake or mounted on any portion of the breakwater. On careful examination of the evidence I am satisfied that it was at the time attached to the stake, properly trimmed and furnished with oil, but that the light had been extinguished, probably by the strong wind then prevailing from the northwest in connection with the defective and negligent manner in which the lantern was mounted on the stake. It was a Funck lantern, with a red lens from six to eight inches in diameter, calculated to burn, without refilling, from eight to ten days, hung in the open air, by means of a ring at its top to a bracket or cross-piece at or near the top of the post or stake at the height of about twenty-five feet above high water. The lantern was furnished to the defendants for use on the stake directly or indirectly by the engineer in charge. When the lantern was suspended from the

bracket or cross-piece its bottom did not rest on any platform, nor was it otherwise prevented from swinging in the wind. When so swinging the lantern was liable to present itself to the wind at such an angle as to allow the wind, through deflection from its dome-shaped top, to blow down against and extinguish the flame. It appears from the evidence that prior to the disaster the lantern was on a number of occasions extinguished, while it should have been burning. The witness Hasskarl who was government inspector in charge of the work on the new breakwater, testified as follows: 'X 87. About how many times did you notice the light on the upper end of the new breakwater out before the Glenochil went ashore? A. I found it out, and noticed it out, but I cannot tell you how often. I do not know that I kept any track of it. * * * X 93. Do you know what the difficulty was with that old lantern? A. Difficulty? X 94. Yes. Didn't it smoke and show very dimly, and sometimes go out? A. Yes, it did all that, I think.' Hasskarl, in an official communication to the engineer in charge, dated October 17, 1898, says of the stake light in question or a lantern similar to it in position, size, construction and adjustment: 'The light at the upper end of the work frequently goes out, or is blown out during storms, and therefore cannot be considered a reliable light.' The insufficiency of the stake light as originally adjusted was, after the accident, recognized by the government, and steps were taken to remedy the evil. The chairman of the lighthouse board in an official communication to the chief of engineers, dated December 6, 1898, says in part: 'The board then reached the conclusion, after careful examination, that the temporary lights on the extension to the breakwater should be standard lens lanterns of the lighthouse board known as "Funck Tubular Lanterns" with pressed glass lens, red in color, and that they should be set upon rigid platforms on posts which should be strongly braced laterally at the present height of 25 feet.' The engineer in charge December 19, 1898, indorsed the communication as follows: 'The temporary lanterns now and heretofore shown on the extension to the breakwater are standard lens lanterns of the lighthouse board, known as the "Funck Tubular Lanterns" with pressed glass lenses, red in color, and is within recommended. It is proposed to set them on rigid platforms as soon as possible.' Hasskarl in an official communication to the engineer in charge, dated January 3, 1899, says: 'I have the honor to report that the lights on the Harbor of Refuge were to-day changed from their former positions on brackets to rigid platforms on posts 25 feet above high water, and their present positions comply in every respect with the recommendations made by the lighthouse board contained in a letter addressed to the chief of engineers under date of December 6, 1898.'

"All of the correspondence above mentioned was admitted in evidence without objection. There is no evidence that after the lanterns had been attached to rigid platforms the light was extinguished by winds or storms. But the question to be decided on this branch of the case is, not whether the officers of the government charged with the duty of properly lighting the new breakwater during the progress of the work or of furnishing means to that end, were guilty of actionable negligence in failing, before the accident and after Hasskarl had become aware of the liability of the original stake light to be extinguished during storms or high winds while the lantern was swinging in the open air, to guard against such a result by adopting the obvious precaution, so tardily resorted to, of placing the original stake light on a rigid platform not subject to lateral motion. Nor is it necessary to go into the vexed question how far contractors, entering into government contracts prescribing or authorizing subordinate officers to prescribe negligent and dangerous methods or instrumentalities for the making of a public improvement, can be held liable by third persons injured by the employment of such methods or instrumentalities. The question now to be decided is whether the defendants were guilty of actionable negligence toward the libelant, causing or contributing to the accident. The new breakwater in course of construction when not properly lighted was an obstruction extremely dangerous to shipping, and in the language of one of the official communications in evidence, 'a greater menace to navigation than it can ever be in the future, from the fact that it is unknown to strangers and not delineated on charts generally of that locality.'

"The defendants, without qualification or condition, undertook in their contract to maintain the original stake light at the northwesterly end of the work,

properly burning. Specification 59 of the contract provides: 'This light will be erected and protected in accordance with the instructions of the engineer officer in charge, or his agent, and it will be maintained by the contractor as long as required by the engineer officer in charge.' Specification 65 also provides with respect to the duty of the defendants, therein termed the 'contractor': 'He must also maintain on the work such lights as the engineer officer in charge may direct. These lights will be maintained at the expense of the contractor.'

"Under these provisions the duty of the defendants was not merely to maintain lanterns in the required positions, but lanterns properly trimmed and brightly burning during the hours of darkness. It is contended, however, on the part of the defendants, that the extinguishment of the stake light by the wind on the night of the accident was an act of God for the consequences of which they are in no manner liable. As between the parties to an express contract the act of God or vis major furnishes no excuse for the nonperformance of what one has by the contract unconditionally bound himself to do. But the stranding of the Glenochil on the new breakwater was in no legitimate sense attributable to the act of God or vis major. It is true that the stake light, improperly adjusted, was extinguished by the wind as a burning and unprotected candle would be blown out in a draught, but it cannot in its relation to the accident be held the act of God. The accident was not 'one which could not have been prevented by human effort, sagacity and care' (The Majestic, 166 U. S. 375, 388, 17 Sup. Ct. 597, 603, 41 L. Ed. 1039), nor was it one arising from purely natural causes impossible by the exercise of reasonable diligence and circumspection to have been perceived and therefore unreasonable to guard against. The contractors were chargeable under their contract with knowledge of 'the facilities and difficulties attending the execution of the work, including the uncertainty of weather and all other contingencies,' and made their proposal 'with full knowledge of the work.' They also had knowledge or are presumed to have had knowledge before the accident that the stake light was liable to be extinguished during storms or high winds. It had gone out several times during the progress of the work and while it was unquestionably their duty to observe whether it continued to burn. It is further contended on the part of the defendants that they had no authority under their contract with the government to erect and maintain other lights on the work than those directed by the government officers in charge, and that it would have been improper for them so to do. But this court is not prepared to hold that the measure of their contractual obligation to the government necessarily limited or defined the precise measure of their duty to third persons, whose lives and property would be exposed to extreme peril, in case of failure to indicate at night the northwesterly end of the breakwater by the maintenance of the stake light, or some other light at that point, or by other means. They owed a duty to such third persons independently of their contractual obligations. They could not in reckless disregard of the lives and property of others shield themselves from accountability for destruction of life or property on the ground that the stake light was extinguished by a force of nature over which they had no control, if by the exercise of reasonable care and precaution they could have adopted proper means to avert the calamity. There is no provision in or implication to be drawn from the contract that, when necessary for the protection of navigation, the defendants should not place on the work in course of construction other lights than those mentioned in the contract or prescribed by the government officers in charge. Such a prohibition would have been inconsistent with the manifest purpose of the contract that to avoid disaster to persons or property the upper end of the breakwater should be properly lighted. For this purpose the defendants undertook to maintain the stake light at that point. As before stated, they were before the accident chargeable with knowledge of 'the uncertainty of the weather' and of the fact that the stake light was liable to be extinguished during storms or high winds. Reasonable care and vigilance required them to guard against the probable consequence of the extinguishment of the light or its failure to burn at night. While owing to the condition of the wind or water it may have been impracticable promptly to relight the lantern whenever the light was blown out in a storm or high wind, no reason is perceived why the defendants should not, in view of the great danger resulting

from darkness at that point, have either there erected an electric light enclosed in a red lens which could have been operated from shore in case of the extinguishment of the stake light, or have made such disposition of their floating plant as to warn vessels away from the new breakwater. In omitting to resort to such or other precautions they failed to exercise the degree of care which the law demanded of them, and were guilty of fault proximately causing or contributing to the accident.

"The question remains whether the Glenochil was not also in fault. She was in charge of a Pennsylvania pilot for the Delaware River and Bay. There is a broad distinction between an ocean pilot, who is compelled to direct the course of a ship mainly by compass, reckoning and astronomical observations, and a river pilot who relies not so much upon the compass as his familiarity with the natural objects and lights along the river. In Atlee v. Packet Co., 21 Wall. 389, 396, 22 L. Ed. 619, Mr. Justice Bradley, delivering the opinion of the court, said: 'The character of the skill and knowledge required of a pilot in charge of a vessel on the rivers of the country is very different from that which enables a navigator to carry his vessel safely on the ocean. In this latter case a knowledge of the rules of navigation, with charts which disclose the places of hidden rocks, dangerous shores, or other dangers of the way, are the main elements of his knowledge and skill, guided as he is in his course by the compass, by the reckoning, and the observations of the heavenly bodies, obtained by the use of proper instruments. It is by these he determines his locality and is made aware of the dangers of such locality if any exist. But the pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through. which he steers his vessel. In the long course of a thousand miles in one of these rivers, he must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently erected in the course of the river, as sand bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of changes in the current of the river, of sand bars newly made, of logs or snags, or other objects newly presented, against which his vessel might be injured. * * * It may be said that this is exacting a very high order of ability in a pilot. But when we consider the value of the lives and property committed to their control, for in this they are absolute masters, the high compensation they receive, and the care which Congress. has taken to secure by rigid and frequent examinations and renewal of licenses this very class of skill, we do not think we fix the standard too high.' This language clearly is applicable to pilots whose vocation is to control the course of vessels into and out of the Delaware Bay and River and their anchorage therein. Like river and harbor pilots, they are chargeable with knowledge of natural objects on shore and the obstacles to navigation, and of the significance of fixed or permanent lights. The pilot in charge of the Glenochil had large experience in his calling. For some fifteen or sixteen years he had been engaged in piloting steam and sailing vessels of all sizes into and out of the Delaware Bay and River. He was thoroughly familiar with the relative positions of the old and new breakwater, with their distance apart, with the stake light on the latter, and with the range and other lights visible in that locality. He boarded the Glenochil a short distance outside of the capes about or shortly after midnight; that vessel being bound to the old breakwater for orders and intended to anchor there for that purpose. When the proposed anchorage was reached, 'just outside of the old breakwater,' the master ordered that the starboard anchor be let go. This order was not carried out owing to the jamming or fouling of the windlass. At this time and until the accident there was a strong wind from the northwest. The night, however, was clear, not only the stars, but the range and other fixed lights capable of being seen in that locality, being distinctly visible. Upon the failure of the starboard anchor to drop, owing to the defective condition of the windlass, the master directed

125 F.—55

that the Glenochil be put to sea, in order that preparations might be made for the use of the port anchor. The pilot forthwith ordered the helm ported and the Glenochil swung to starboard under a full head of steam; and being light and the direction of the wind being against her starboard bow, she failed to swing to starboard with sufficient speed to clear the new breakwater, with the result that she ran against and on the same, thereby receiving the damage complained of. There is some expert evidence to the effect that, owing to her lightness and the direction and force of the wind, it was impracticable for her to swing under a port helm from the proposed anchorage clear of the new breakwater. If this be a fact, of which I have considerable doubt on the evidence as a whole, the pilot was chargeable with knowledge of it, and, knowing the position of the new breakwater relatively to the old and the distance between them, he should have so regulated her movements as to avoid the disaster, there being an abundance of sea room for that purpose, as hereinafter stated. Although aware of the fact that the upper end of the work was provided with a stake light it does not satisfactorily appear from his evidence or from any other evidence in the case, when he first looked for that light or ascertained it was not burning. On his own showing the pilot convicts himself of gross negligence or incompetency directly contributing to the accident. He testifies in part as follows: 'Q. Was the place selected by you to anchor the Glenochil a proper place? A. Yes, sir. Q. Was it a place in which you have anchored other vessels? A. Yes, sir; many a time. * * * Q. Well, when he told you to put the Glenochil to sea again, what did you do? A. I put the wheel to port and rung her up. * * * Q. Well, now, then what happened? A. Well, I stranded on the breakwater. I thought I was closer to the old breakwater than I was. * * * Q. Please state whether there was any light on the upper end of the breakwater or not? A. No light at all. Q. Are you positive about that? A. Yes, sir. Q. What kind of a night was it with respect to seeing lights? A. Why, it was a right nice night to see lights. * * * Q. Please state whether there was anything in the character of the night that night, which would have prevented you seeing a light upon the upper end of the breakwater had one been there? A. Nothing at all, sir. * * * Q. Had you been by the new breakwater frequently or not? A. Yes, sir. Q. Did you know where it was? A. Yes, sir. Q. Well, if you knew where the new breakwater was, why didn't you avoid it? A. Well, if there had been a light there, we could have avoided it, but there was no light at all. * * * XQ. Have you any recollection as to how long that light had been showing on the new breakwater before you had this accident? A. Yes, sir. Well, it was there quite a while off and on. * * * XQ. How near to the old breakwater do you judge you were, when you gave the order to let go the anchor? A. About three-quarters of a mile, probably a little further, I judge. XQ. And it was that distance which you say you were mistaken in? A. Mistaken? XQ. Didn't you say you thought you were mistaken in supposing that you were so close to the breakwater when you gave the order to let go the anchor? A. No, sir. XQ. Then, do you still state you were about three-quarters of a mile from the old breakwater when you gave the word to let go the anchor? A. Yes, sir. XQ. That is your present judgment? A. Yes, sir. XQ. That was your judgment at the time you gave the order? A. Yes, sir. XQ. Do you know of any reason to change that judgment? A. No, sir. * * * XQ. Mr. Bennett, how far is it in a straight line from the old breakwater to the new breakwater, as far as the new breakwater was sticking up above the surface at low tide in November last? A. I should judge about two miles. * * * XQ. When you gave the order to port the wheel, I judge from the distance that you have told me that you were off, you had about a mile and a quarter of clear water to turn around in; is that about right? A. Yes, sir; but I was deceived in my judgment. XQ. Now, think about it, and tell me how near you were actually to the new breakwater when you gave the order to port the wheel? A. Well, I couldn't. I judge I was that distance from the old breakwater, and I judged wrong. * * * XQ. That was a mistake, wasn't it, Mr. Bennett, that you had as much as a mile and a quarter of clear water to turn around in? A. Oh, certainly, it was a mistake. * * * XQ. Are you able to make a judgment how far

off, in your best judgment, you were from the new breakwater when you gave the order to port your wheel? A. No, sir; I couldn't, because I don't know. XQ. Now, when you heard that hail from the forecastle you didn't suppose you were anywhere near the new breakwater, did you? A. No, sir. XQ. Didn't you think the new breakwater was half a mile or so over to your port side? A. I thought the breakwater was further off. I judged that I could come out clear. * * * XQ. You hadn't any more expectation of hitting the new breakwater, the stone pile, that night than you have to-day? A. No, sir; not a bit. XQ. You didn't suppose that you were within half a mile of it? A. I didn't suppose I was within a mile of it. XQ. Well, had you been looking for that red light on the stone pile? A. I had been previous. I had been looking for it that night. * * * XQ. Do you recollect looking for that red light on the stone pile? A. Yes, sir. XQ. When did you look for it? A. I looked for it as I was turning the ship around. XQ. You did not see it? A. No, sir. XQ. You didn't think that was anything remarkable? A. Yes, sir; because it was published to be put there. XQ. You didn't see it; didn't that make any change in your navigation? A. No, sir. Why how could that make any change? Then it was too late to make any change. I didn't see it. XQ. You mean it was too late when you thought to look for the light? A. I looked for the light as I tried to turn the steamer. I was too close to the breakwater. XQ. You didn't think to look for the light until you were that near, that it was too late? A. Oh, yes, sir; I looked for the light. If a light had been there, I could have reversed the engines and wouldn't have hit. XQ. Now, Mr. Bennett, what I am asking you is whether you recollect looking for that light when you first started to turn around the Glenochil? A. Yes, sir. XQ. Well, now you told me it was ten minutes before you hit, wasn't it? A. I suppose it was; somewheres around there. * * * XQ. And you didn't see it? A. No, sir. XQ. And it was a good night for seeing lights, and you saw all the other lights around you? A. Yes, sir. * * * XQ. Well, Mr. Bennett, didn't you think your judgment was good enough to keep clear of that stone pile, even if you didn't see the light? A. Well, if I had known there was no light there. XQ. You knew that there was no light there that night? A. I didn't know until I got in there. XQ. You knew that you didn't see any light there that night? A. Yes, sir. XQ. For ten minutes before you hit? A. No, sir; I didn't say that. XQ. Didn't you say that you were looking for that light when you gave the order to port the wheel? A. No, sir; I did not. XQ. You don't remember saying that? A. No, sir. XQ. Well, now, how long after you gave the order to port the wheel, do you think, that you did look for that lantern? A. I couldn't tell you. It was before I struck. I know the light was gone. I looked for the light and I thought I had plenty of room to come around. XQ. Did you look for the light before you heard the hail from the forecastle? A. Yes, sir. XQ. How long before? A. Why, it wasn't no time. I hadn't gotten my glasses down. XQ. You were just looking for the light when you heard the hail from the forecastle? A. No, sir. Hold on, I am going too fast. No, I looked for the light, and afterwards I heard the hail, because I thought I had plenty of room. XQ. You had been looking for the light through your glasses? A. Yes, sir. XQ. And just as you took your glasses down, you heard this hail? . A. Oh, no; it was a little while afterwards I heard the hail. XQ. Well, as much as two seconds? A. Oh, yes, sir; it was a long while. I couldn't tell you how long it was. * * * XQ. What I understand you to say now, Mr. Bennett, that you looked for the light once, a little or some while before you heard the hail from the forecastle? Oh, yes; quite a while before I heard the hail. XQ. And you looked through the glasses? A. Yes, sir. XQ. And you didn't see it? A. No, sir. XQ. But you thought you were giving the stone pile a good berth, anyhow? A. Yes, sir. XQ. So you went ahead? A. Yes, sir. Certainly if the light had been there, there would have been no trouble at all. * * * XQ. How long before you struck the stone pile, in your best present judgment, was it that you noticed that there was no light on the stone pile? A. Quite a while, as I said before. * * * XQ. Do you think it was as much as three minutes? A. I think it was as much as four minutes. XQ. That is your best judgment? A. Yes, sir. XQ. Four minutes? A. Yes,

five minutes. XQ. Will you stick to five minutes? A. Yes, sir. XQ. Then it was five minutes before you hit, that you satisfied yourself that there was no light on that stone pile? A. Yes, sir.' It thus appears from the testimony of the pilot that, notwithstanding the range and other fixed lights which should fully have informed him, he was in substantial error as to the distance of the proposed anchorage from the old breakwater; that, knowing the Glenochil was light and the wind on her starboard bow, he ported her helm in an attempt to swing her to starboard and clear the new breakwater on his way to sea for the purpose of gaining time to prepare for the lowering of the port anchor; that he knew the distance of the new from the old breakwater; that at the proposed anchorage the stake light on the upper end of the new breakwater if burning would have been distinctly visible; that had he known at the time that the stake light was not burning he could have avoided the new breakwater; that he did not look for that light or ascertain that it had been extinguished until several minutes after the helm was ported or until very shortly before the accident; that he knew a light should have been burning there; that if the light had been burning, the Glenochil could have been put full speed astern and the accident prevented; and that he had satisfied himself five minutes before the Glenochil struck that the stake light was not burning, yet instead of reversing, kept her on a port helm under a full head of steam. * * *

"Further, there is no evidence that after it was discovered that the windlass was jammed or fouled there was any necessity to put to sea or execute the maneuver attempted. The Glenochil at the time in question drew only fifteen feet of water and the tide was about high water slack. The official charts used in evidence show that for a distance of about three miles west northwestwardly from the proposed anchorage there was an ample depth of water for the navigation of the Glenochil even at mean low tide, and that this inner basin had a width of equal depth for about two miles. No reason is disclosed or perceived why the Glenochil under these circumstances should have attempted to go to sea. She could, while preparing the windlass for the lowering of her port anchor, have proceeded slowly up this basin and when proper have returned to the proposed anchorage either by going astern or by turning and heading for it. The evidence abundantly shows that there were sufficient range and other fixed lights to enable her to accomplish her ultimate purpose without resorting to the improper movements resulting in the disaster. It was further the duty of those in charge of the Glenochil when entering the bay for the purpose of anchoring, with the wind so strong as repeatedly to extinguish her binnacle light, to see to it that she was in proper order to anchor, and guard against the fouling or jamming of her windlass. While the last point may not of itself be sufficient to inculpate the Glenochil, I am satisfied by the evidence as a whole that she was in fault, and that it proximately contributed to the accident. Counsel for the libelant have referred to Casement v. Brown, 148 U. S. 615, 13 Sup. Ct. 672, 37 L. Ed. 582, as establishing the proposition that there was no fault on the part of the Glenochil, and counsel for the defendants have referred to the same case as establishing the proposition that the defendants are not liable. I am satisfied on careful examination that the facts disclosed in that case were so unlike those in this, that it cannot be treated as an authority supporting either proposition. As the Glenochil as well as the defendants was in fault she is entitled to recover only one-half of the damages and costs. Let a decree be prepared accordingly."

The point made by the appellant, presumably not raised in the court below as it is not covered by the opinion of the learned judge, just quoted, that, inasmuch as the Glenochil was obliged by law to take a pilot, his negligence cannot be imputed to the ship, requires from us only a brief notice. It is admitted that, at common law, no action can be maintained against the owner of a vessel, for the fault of a compulsorily taken pilot, as, in such case, the pilot is in no sense the agent or servant of the owner; but, although the same doctrine holds in

England, both at common law and in admiralty, a different view of the liability of the ship is taken in admiralty cases in this country. The China v. Walsh, 7 Wall. 53, 19 L. Ed. 67; Ralli v. Troop, 157 U. S. 386, 402, 15 Sup. Ct. 657, 39 L. Ed. 742; The John G. Stevens, 170 U. S. 113, 120, 18 Sup. Ct. 544, 42 L. Ed. 969; The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954; Homer Ramsdell Co. v. Compagnie Generale Trans Atlantique, 182 U. S. 406, 411–413, 21 Sup. Ct. 831, 45 L. Ed. 1155. The theory of the admiralty law in this country in such cases, is that the collision impressed upon the wrongdoing vessel a maritime lien, which the vessel carries with it into whosesoever hands it may come. The vessel is treated, according to this theory, as the guilty thing. It is the res, to which fault is imputable, and which is held to respond in damages. The responsibility of the owners, as owners, and the law of agency, as applicable to the employment of a pilot, do not come into consideration. "This theory treats the faults of conduct in the vessel's navigation as imputable to the vessel itself." Ralli v. Troop, supra. It is true that in the present case, the libelant, as the master of the ship Glenochil, proceeded against the defendants in personam; but the suit is in admiralty, and the defense inculpates the vessel and not the owners, so that the law of agency, as applicable to their liability, is not involved in the consideration of the case.

The decree of the court below is affirmed.