### THE ROBERT RICKMERS.

(District Court, D. Washington, W. D. July 22, 1904.)

#### No. 364.

1. COLLISION—ANCHORED VESSELS—DRAGGING ANCHOR IN GALE.

An anchored schooner *held* not in fault for a collision with another vessel which dragged anchor and drifted against her at night in a gale, either because her captain was on shore, or because she did not hoist sail and attempt to move out of the way, where it appeared that those in charge were competent, and it did not appear that the setting of the sails would not have been as likely to increase as to diminish the danger, and it would have been likely to cause her to drag her own anchor.

2. SAME.

A vessel which came into an open bay in tow of a tug while a high wind was blowing, and anchored for the night in the vicinity of other anchored vessels, and which during the night dragged her anchors and drifted against a schooner anchored at a distance of half a mile, *held*, on the evidence, in fault for the collision, either because not equipped with suitable

and safe anchors, or because she was not properly anchored; the anchors of all other vessels in the bay, of which there were a number, having held.

3. SAME—IMPROPER PLACE OF ANCHORAGE—SELECTION BY MASTER OF TUG.

The fact that the place of anchorage of a sailing vessel during a high wind was selected by the master of a tug having her in tow does not relieve her from liability for damage caused to another vessel against which she drifted, having lost one anchor and dragged the other, due to the fact that she was placed so near other vessels that she could not be given sufficient room to swing, or to secure the combined holding power of both her anchors.

In Admiralty. Suit in rem to recover damages for injuries inflicted upon a vessel at anchor by another vessel dragging her anchor in a gale. Heard on the merits. Payment of damages decreed, on the ground that the drifting vessel was in fault for not being more securely moored.

Hughes, McMicken, Dovell & Ramsey, for libelant.
James M. Ashton, for respondent.

HANFORD, District Judge. This is a suit in rem to recover damages for injuries to the four-masted schooner Stimson, caused by the German bark Rickmers. The locality of the mishap is that part of the waters of Puget Sound designated on the charts as "Shilshole Bay," on which the city of Ballard is located. The bay, so-called, is formed by a mere curvature of the eastern shore of Puget Sound, and is more of an open roadstead than a sheltered harbor; but the depth of water and material of the bottom afford good anchorage and plenty of room for a large number of vessels to lie at anchor with sufficient length of cables for safety. The time of the mishap was about 11 o'clock p. m., December 25, 1901, the night being dark, but clear, and the weather tempestuous; that is to say, there was a high wind, which, during the night and the day previous, came in gusts of varying force, and veering in direction from southwest to southeast. The Stimson is a large four-masted schooner, of approximately 700 tons burden, and at the time referred to was partly loaded with a cargo of lumber, and was at anchor about five-eighths of a mile off shore, and held securely by one anchor with 105 fathoms of chain; the depth of water at that place being approximately 27 fathoms. The schooner Mildred and the schooner Corona were also anchored in the bay about half a mile southward from the Stimson, and a little less than one-quarter of a mile from each other, the Mildred being farthest off shore; and both the Stimson and the Mildred were to the westward of a line drawn straight from West Point to Meadow Point, which are the headlands of the so-called bay, so that both vessels were outside of Shilshole Bay, in the open waters of Puget Sound. The Rickmers, a German bark of about 2,200 tons burden, on the afternoon previous to the accident, while being towed to Tacoma in ballast, was brought into the bay for anchorage, on account of a strong head wind, and taken to a position a little less than a quarter of a mile to the eastward and in shore from the Mildred, and about the same distance southwest from the Corona, where she dropped her port anchor, in 14 fathoms of water, and paid out about 40 fathoms of cable. Instead of fetching up properly and being held by her an-

chor, her compressor—which is a contrivance for clutching the anchor chain to ease the strain upon the windlass—broke, and 10 or more fathoms of additional chain was paid out from the windlass, and the vessel drifted towards the schooner Corona, and into dangerous proximity, so that a collision with her was imminent. The latter vessel was maneuvered by use of her sails in a manner to assist in avoiding a collision. The tug again attached her tow line to the Rickmers, and pulled her back to very nearly the position first selected for anchorage, without lifting her port anchor. The Rickmers' starboard anchor was then dropped, with about 30 fathoms of cable, and she was left in that position by the tugboat. Lines connecting the positions of the Rickmers, Mildred, and Stimson upon the chart form an isosceles triangle; the Rickmers and Mildred being at the two ends of the base, or short line, of the triangle, and each of them being proximately half a mile southward from the Stimson. At 10 p. m. the wind was blowing a gale from the southeast, and the force thereof caused the Rickmers to drag her anchors, and drift towards the Mildred, and she actually came into collision with the jib-boom of that vessel, doing some damage, and then continued drifting, and sheered to the northward towards the Stimson. After getting clear of the Mildred, it was discovered that the Rickmers had lost her port anchor, and then more anchor chain was paid out to the starboard anchor, until the total length of cable on her starboard anchor was 90 fathoms. She continued to drag anchor, and drifted northward until she came into collision with the Stimson, and locked with her, and both vessels dragged their anchors and were driven northward several miles before they were separated, and by the collision the Stimson suffered the injuries for which damages are claimed in this suit.

The respondent defends on two grounds, viz.: First, the casualty was an inevitable consequence of the extreme violence of the storm, and the Rickmers was blameless; second, the Stimson was herself in fault, because her captain was ashore, and she did not have a vigilant lookout, and neglected to attempt any maneuver to avoid the collision. In support of both of these defenses testimony of expert witnesses has been introduced. I feel obliged to treat these defenses seriously, because able and experienced counsel has argued the propositions earnestly and with great ingenuity.

I will dispose of the second proposition first, and in this connection I find that the Stimson was securely anchored at a place where she had a lawful right to be; that the officers and crew on board at the time of the accident were competent to take proper care of a vessel at anchor, the regulation anchor light was set, and a vigilant watch was kept. While the storm prevailed, she depended for safety upon her anchor, which proved to be sufficient to keep her in her place until the added weight of the Rickmers caused her to drag. She was not under any legal or moral obligation to abandon the security which her anchor afforded merely because a strange vessel had come into her vicinity. The duties of a captain do not require him to remain on board of his vessel constantly while she is at anchor, and there is no reason to suppose that the casualty could have been averted by the Stimson's captain, if he had been on board. The captain of the Rickmers, in his

testimony, blames the Stimson for failure to put her helm hard-astarboard. He appears to think that, if that had been done, the collision would not have happened. It is my understanding that a vessel cannot be made to change her position by use of her helm when she does not have steerageway, and the testimony of the captain does not directly controvert this principle of natural philosophy; nor does he assign any reasons for supposing that, if the Stimson's helm had been put hard-astarboard, it would have had any effect either to check or change the movements of the Rickmers. The argument in behalf of the respondent, based upon testimony of expert witnesses, assumes that it would have been possible for the Stimson to have used her sails in a manner to have forced her to swing on her cable inshore, so that the Rickmers might have passed without colliding. This, however, is only a suggestion of a mere possibility. To be fair, the Stimson cannot be convicted of a fault upon any theory which ignores the obvious hazard of any attempt to set her sails at a time when the wind was blowing with such force as to drive the Rickmers, without sails and against the resistance of her anchors. If the Stimson's sails had been set and filled for the purpose of changing her position while the gale continued, in which direction would she have moved, and where would she have fetched up? Unless an intelligent answer to this inquiry can be given, there can be no basis whatever for supposing that the Stimson could have changed her position without increasing, instead of diminishing, the danger to which she was exposed. In the argument, the action of the Corona is instanced, and it is said that equal vigilance and skill on board the Stimson would have kept her out of the path of the Rickmers. There are differences, however, which I am bound to notice; differences both in direction and velocity of the wind. The position of the Rickmers, when she commenced to drift, after dropping her anchor the first time, was southwest of the Corona, and the wind at that time was from the west or southwest, and its velocity was only 10 miles per hour. The Corona could very well, under those conditions, be moved a short distance without any imprudence. That event was at about 5 o'clock p. m. At 11 o'clock, when the Rickmers made trouble for the Stimson, the wind had increased to 35 miles per hour and was coming offshore from the southeast, the Rickmers had dragged her anchor westward one-fourth of a mile when she came into collision with the Mildred, and her position there was a little west of south from the Stimson, and, as I have before indicated, the distance was half a mile. If her movements could have been observed in the darkness, they indicated nothing as to her course, except that she was not under control. Therefore the Stimson could not execute any movement to get out of her way which would not be as likely to bring the two vessels into collision as to avoid a collision.

Recurring, now, to the main question in the case, which is whether the Rickmers was in fault, I will say, preliminarily, that the Stimson being entirely free from blame, and, the Rickmers being the aggressor, there is a natural and legal presumption that the damage which she caused was due to her fault, and to be entitled to exemption from lia-

bility she must prove good seamanship in her management, and that her ground tackle was in condition fit for the service required, so that there was no imprudence in releasing the tug and trusting her anchors, in view of the existing conditions. The natural presumption is strengthened in this case by the indisputable fact that the other vessels exposed to the same force were held securely by their anchors, proving that, if the Rickmers had been equipped with suitable anchors for a vessel of her size, and with sound cables of sufficient strength, and if she had been carefully moored by placing her anchors properly, so as to have secured the advantage of their combined holding power, with sufficient length of chains and room to swing without coming in contact with the other vessels, she, too, would have withstood the storm without damage; but, instead of behaving as other vessels in the bay behaved, the Rickmers acted like an evil sprite, first making a hostile demonstration towards the Corona, which frightened that little craft into making extraordinary maneuvers, later striking out to the westward, breaking the Mildred's nose, and then rushing north to embrace the Stimson, and wildly dancing with her to the music of the hurricane for a distance of seven or eight miles. I can admire, though I cannot adopt, the ingenious theories of the expert witnesses by which they exculpate the Rickmers from all blame, and also condemn the Stimson for not being sufficiently alert and nimble to keep out of the reach of the impetuous stranger. The word "expert" appears to be peculiarly apt and appropriate for describing the testimony upon which the respondent relies. Considering the threatening weather when the Rickmers came into the bay, and the unbroken sweep of the wind, with the exception of the little protection afforded by Magnolia Bluff, a careful navigator would have chosen a position for anchorage which would have enabled his vessel to swing with ample scope of cable without danger of colliding with other vessels previously anchored in the bay. The excuse offered for not paying out more cable than 40 fathoms on the port anchor and 30 fathoms on the starboard anchor was that greater length of chain would have caused the Rickmers to swing dangerously near the Mildred and the Corona. This proves that an inexcusable error was committed in choosing the place for anchoring, and the captain of the Rickmers in his testimony claims that he was not satisfied with the location, but dropped anchor at the place indicated by the captain of the tug, who, it is insisted, must be held responsible as a local pilot. This, however, does not relieve the Rickmers from legal liability. She is answerable for damages caused by the inexcusable errors of whoever for the time being had control of her movements, whether in the capacity of master, chief mate, or local pilot. Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155; The China v. Walsh, 7 Wall. 53, 19 L. Ed. 67; The Merrimac, 14 Wall. 199, 20 L. Ed. 873; Ralli v. Troop, 157 U. S. 386, 15 Sup. Ct. 657, 39 L. Ed. 742; The John G. Stevens, 170 U. S. 113, 18 Sup. Ct. 544, 42 L. Ed. 969; The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954; Harrison v. Hughes, 125 Fed. 860, 60 C. C. A. 442.

From the evidence I find that the actual damages to the Stimson legitimately chargeable to the collision amount to the aggregate sum of $18,-

680, for which amount, with interest and costs, a decree will be given in favor of the libelant. In this amount there is included $9,388 for expenses paid for repairs, and for unloading and reloading, and necessary expenses of the ship during 74 days of detention; $5,000 for estimated permanent damage by impairment of the salable value of the ship; and $4,292 for demurrage at the rate of $58 per day for 74 days.