## THE ROBALISS III.

### CORBY v. RAMSDELL et al.

District Court, S. D. New York.

Aug. 1, 1930.

Macklin, Brown, Lenahan & Speer, J. Dudley Eggleston, and Horace L. Cheyney, all of New York City, for libelant.

Duncan & Mount and Russell T. Mount, all of New York City, for respondents.

GODDARD, District Judge.

This libel was filed by the owner of the yacht Robaliss III to recover damages alleged to have been sustained by her as a result of striking a submerged pile of rocks off Denning's Point in the Hudson river while bound from New York to Beacon, N. Y., on October 1, 1926.

The history of these submerged rocks and the circumstances relating to the Robaliss III coming in contact with them are as follows:

About 1865 a corporation known as the Boston, Hartford & Erie Ferry Extension Railroad Company conceived the plan of having cars with freight from New England transferred to car floats on the Hudson river, and from there transported to various railroad terminals in the vicinity of New York City. In furtherance of the plan, in the years 1865, 1866, and 1869, they secured, from the state of New York, grants of land under water extending from the shore in the vicinity of Denning's Point, which is located on the east side of the river a few miles below Fishkill, for the purpose of building a pier or trestle running from the shore to the deep water channel; these grants contained the following provision: "Excepting and reserving to all and every the said People, the full and free right, liberty and privilege of entering upon and using all and every part of the above described premises, in as ample a manner as they might have done had this power and authority not been given, until the same shall have been actually appropriated and applied to the purposes of Commerce, by erecting a Dock or Docks thereon. And these presents are upon the express condition that if the said Boston, Hartford & Erie Ferry Extension Railroad Company assigns shall not within —— years from the date here-

of actually appropriate and apply the above described premises to the purposes of Commerce, by erecting a Dock or Docks thereon and filling in the same, then these presents and everything herein contained shall cease, determine and become void." After obtaining the land, construction of the pier was begun. Four abutments were constructed; the first being 60 feet off the shore, and three others placed at equal intervals apart, the last abutment being located some 646 feet from the high-water mark and between 25 and 30 feet from the main channel, which is 675 feet from the shore. Stringers were put in position connecting the abutments. But, before the pier was completed, the railroad company was compelled, because of lack of money, to abandon the idea, and in 1872 the land under water, with the uncompleted pier, was sold under foreclosure proceedings to Homer Ramsdell, who died in 1894, and the respondents have since held the property as trustee under his will. The abutments were each about 20 feet square and were constructed of a wooden crib filled with stones, and, as originally built, they stood about 4 feet above the water at high tide. In 1894, when the respondents became vested with the title to the property, the abutments still stood 4 feet above high water, but, as the years passed, the wooden crib decayed, no repairs were made, and, as a result, it fell apart, and the action of the ice and elements caused the stones to spread out into an irregular pile, and in recent years it was visible only at extreme low water, with no warning or mark to indicate its existence.

On October 3, 1926, the Robaliss III left her anchorage off West Eighty-Sixth street, New York City, for Beacon; she was a gasoline yacht 73 feet 3 inches long, 12 foot beam; 800 horse power, draft slightly over 4 feet; she carried a crew of four men; her full speed was 24 miles an hour. She proceeded up about the middle of the river, and, after passing Palopel Island, she headed directly for Beacon; when off Denning's Point and proceeding about 20 miles an hour, she struck the pile of rocks which has been described; after continuing on for some 150 yards, she filled and sank. At the time she struck, which was between 4 and 4:30 o'clock in the afternoon, the tide had been on the flood for upwards of two hours, and in that vicinity the rise of the tide is about 3 feet. The master of the Robaliss III testified that, although he had been navigating for many years, he had been up the Hudson river but twice; the last time previous to this occasion being over ten years ago, and that he did not know of the abutment and it was not visible. Lem Streeter, who had for forty years been a riverman and boatman in this vicinity, and who was called as a witness by the respondent, testified on cross-examination that, in the last twelve or fifteen years, he had pulled off from these rocks for people who had gone on them, a dozen or fifteen boats, the largest being about 40 feet long. Mr. Ramsdell, the respondent, testified that he had lived in this vicinity all his life, and that he remembered when the abutments had been built; that after title to the land was acquired by his family, they were never used and nothing was ever done to them; that in recent years, they had fallen apart, so that they were submerged at high water, but that he had never received any complaints about them, nor heard of any boats going upon them; that they had not been marked.

The libel alleges "that the respondents being in possession and control of said wharf permitted it to fall into a state of decay so that the outer end thereof, consisting of piles and stones, was submerged at high water and constituted an unlawful obstruction to the safe navigation of the Hudson River," and while the Robaliss III was proceeding up the Hudson river "it struck upon the outer end of said wharf, which was not marked in any manner and which was then completely under water."

The answer to the libel alleges that the abutment "was constructed by the Boston, Hartford and Erie Ferry Extension Railroad Company, under letters patent from the State of New York prior to 1872 when the said Homer Ramsdell became owner of the land referred to in the libel, and was never altered, modified or used by the said Homer Ramsdell or by anyone else subsequent to 1872. The said foundation, and particularly the outer end thereof, was constructed at a point where the depth of water did not exceed four feet at low water, and the outer end of said stone foundation was visible above water at all times excepting high water and was clearly discernible even when submerged. The said stone foundation had, prior to the purchase of the land in question by the said Homer Ramsdell in 1872—fifty five years ago—become a permanent physical feature of the non-navigable part of the Hudson River, and was clearly marked on the chart of the United States Coast and Geodetic Survey covering this reach of the Hudson River, namely—chart No. 282, and on all other official maps and charts, and was also well known to all navigators familiar with this

part of the Hudson River, and did not constitute an obstruction to navigation."

The government chart shows a depth of 4 feet of water over these flats at low tide, and on chart No. 282 issued in June, 1907 and re-issued in June 1929, there is a small black line extending out from Denning's Point to the main channel, but whether such chart was on board the Robaliss III at the time is doubtful; I think not, but there is no doubt that those navigating the Robaliss III at the time had not examined this chart and were not navigating by chart. Denning's Point is approximately 1¼ miles above Palopel Island, and the river in this vicinity is 1¼ miles wide, and the main channel with a depth varying from 16 to 45 feet is seven-eighths of a mile wide, and on each side of this deep channel are the reaches of the river or the flats, several hundred feet wide, where the water at low tide has a depth varying from 2 to 8 feet.

The Hudson river in the vicinity where this occurred is navigable water. People v. Hudson River Connecting R. R. Corporation, 228 N. Y. 203, 126 N. E. 801.; Blanchard v. Western Union Telegraph Co., 60 N. Y. 514, and it is settled that a navigable river is open to navigation from shore to shore, subject only to natural obstructions and to such artificial obstructions as are legally there. That twelve or fifteen other boats had gone upon this pile of rocks is at least an indication that their character and location were such as to be a dangerous obstruction. There is no doubt that such a pile of submerged rocks which endanger navigation, even of small craft, was an obstruction, and the important question is whether these rocks in the condition that they were in at the time, unmarked, was an illegal obstruction, and, if they were, is this respondent liable for such obstruction?

The original grants to "The Boston, Hartford & Erie Railroad Co., heirs and assigns" were based "upon the express condition that, if the said Boston, Hartford & Erie Railroad Company assigns shall not within —— years from the date hereof actually appropriate and apply the above described premises to the purposes of commerce by erecting a dock or docks thereon and filling in the same, then these presents and everything contained shall cease, determine and become void." The dock has never been completed, and, instead of a complete dock appropriated to commerce, a mere series of abutments were placed in the river which interfered and obstructed navigation, and it

may be that, under all the circumstances, the respondents have assumed liability for them, but it is unnecessary to base respondents' liability upon that situation, nor is it necessary to say that in their original condition they were an illegal obstruction and a danger to navigation. Originally, and when taken over by respondents, they were visible and thus a warning. Respondents knowingly allowed them to fall apart, so that, instead of showing 4 feet above high water, they became scattered and hidden beneath the water except at low tide. This was a new and dangerous condition for which the respondents are liable.

It is clear that the respondents succeeded to the rights of the original grantee and would have been entitled to complete the pier and use it in accordance with the terms of the grants, and accompanying this right were some obligations, one of them being to use care to prevent the abutments from falling apart and so become a new and more dangerous obstruction to navigation because of being submerged, or, if this did happen, to warn navigators.

When the owner has the exclusive right to make use of the abutment, his obligation to maintain it in such a condition that it does not become a danger to navigation is not entirely dependent upon his actual use of it.

The title and rights of an owner of land under navigable water are subject to the public's rights of navigation. United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746; Lewis Blue Point Oyster Cultivation v. Briggs, 229 U. S. 82, 33 S. Ct. 679, 57 L. Ed. 1083; Tiffany v. Town of Oyster Bay, 234 N. Y. 15, 136 N. E. 224, 24 A. L. R. 1267.

There is no provision or implication to be drawn from the grants that, when necessary for the protection of navigation, at least while the pier is under construction or in a dangerous condition, proper warning should not be given. In Red Star Towing & Transportation Co. v. Snare & Triest Co., 194 F. 672, the Circuit Court of this circuit said: "But authority to obstruct a navigable stream by building the abutments of a bridge which can be seen and avoided, is not authority to leave such abutments when unfinished and below the surface of the water without any mark or warning. Authority to obstruct navigable waters by building a breakwater is not authority to leave the new construction without a light. Harrison v. Hughes, 125 F. 860, 60 C. C. A. 442." See, also, Williams v. Edward Gillen Dock, Dredge & Const. Co. (C. C. A.) 258 F. 591.

I think that the respondents were liable for this obstruction which they had knowingly permitted to get into such a defective condition as to be a new danger to navigation of which no warning was given.

█ Those in charge of the Robaliss III cannot be said to be at fault; they were proceeding where they had a right to, when they were legally justified in assuming that no one would have caused a submerged obstruction to exist without suitable warning.

Accordingly, the libelant may have a decree with the usual reference as to the amount of damages.