WILLIAMS v. EDWARD GILLEN DOCK, DREDGE & CONSTRUCTION CO.

(Circuit Court of Appeals, Sixth Circuit.  June 30, 1919.)

No. 3256.

1. NAVIGABLE WATERS ☞19—OBSTRUCTIONS—DUTY.
    Any one placing an obstruction such as a breakwater in a navigable lake outside of a much-used harbor is bound to exercise reasonable care for the safety of all persons making use of the harbor, and such duty requires the placing and maintaining of a suitable warning light at night.

2. NEGLIGENCE ☞55—CONTRACTORS—LIABILITY OF OWNER.
    After a contractor has turned over the work and it has been accepted by the owner, the contractor incurs no further liability to third persons; the responsibility for maintaining it and of giving notice or warning of dangers being then shifted to the owner.

3. NAVIGABLE WATERS ☞19—CONTRACTORS—LIABILITY OF OWNER.
    The United States government, which engaged a contractor to construct a breakwater outside the Cleveland harbor, *held* to have accepted the section of the breakwater already constructed, so that the contractor was not liable for the death of one on a vessel which struck the breakwater, due to the absence of warning lights.

4. EVIDENCE ☞245—ADMISSIONS—STATEMENTS OF GOVERNMENT ENGINEER.
    In an action against a contracting company, which was building a breakwater for the government, evidence that the government engineer in charge of the work, after the accident, stated that the government was maintaining a light on the end of the breakwater for the accommodation of the defendant, is admissible only for the purpose of impeaching the tes-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

timony of the government engineer that the section of the breakwater against which the vessel collided had been accepted by the government, etc.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John M. Killits, Judge.

Action by Kathryn Williams, administratrix of the estate of G. A. Williams, deceased, against the Edward Gillen Dock, Dredge & Construction Company, a corporation. There was a judgment for defendant, and plaintiff brings error. Affirmed.

S. H. Holding, of Cleveland, Ohio, for plaintiff in error.

H. D. Goulder and Thos. H. Garry, both of Cleveland, Ohio, for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and WESTENHAVER, District Judge.

WESTENHAVER, District Judge. Plaintiff in error, also plaintiff below, brought this action to recover damages for the wrongful death of one G. A. Williams. A trial to a jury was had, and after all the testimony for both sides had been introduced the District Court, on motion, directed a verdict for the defendant. This action of the court below is the only error assigned.

The decedent was an employé on a lake steamer named Junior. This steamer on the night of May 9, 1915, between 11 and 12 o'clock, as it was entering Cleveland harbor, struck against the inside corner of the east end of the breakwater. As a result the boat sank and the decedent was drowned. This collision of the steamer with the breakwater, it is contended, was due to the absence of any light on or near its east end, and on this hearing counsel for both parties make the answer to the question involved to turn on whether or not the duty rested on the defendant to maintain such a light.

. The defendant on July 2, 1914, had made a contract with the proper engineering officer of the United States government to complete the construction of 6,601 feet of the east breakwater extension of the Cleveland harbor, including the east end against which this steamer collided. This work was divided into seven sections, numbered from west to east and from 1 to 7, inclusive; the first six sections being each 1,000 feet in length, and the seventh 601 feet in length. These sections were to be constructed in the order given, from west to east, and work was prohibited on more than two sections in advance of the completed superstructure, except by special permission of the engineer in charge. This engineer, however, directed that the work first to be done should be the completion of the east end in the inverse order stated. By December 1, 1914, not less than 1,800 feet at that end was completely finished, and in such a manner that no further work or labor was required thereon by the defendant under its contract. The contract also provided that acceptance would be made by the engineer on the written request of the contractor, when a continuous length of 100 feet had been completed, as was required, and to his entire satisfaction. A request was made of the engineer in charge

for an acceptance of the 1,800 feet thus completed, and December 16, 1914, the engineer certified in writing that 1,800 linear feet at the east end had been satisfactorily completed and that the same was thereby accepted.

The contract also required defendant to maintain at its own expense lights and signals required by the engineer or by the regulations of the United States Lighthouse Board. The regulations of the United States Lighthouse Board were not introduced in evidence, and the record does not indicate clearly what specific requirements, if any, the engineer in charge made as to lights during the period of construction. A gas buoy light was, however, maintained by the defendant at the east end of the breakwater from the time it began work until about December 1, 1914, when all construction work on the breakwater was, owing to weather conditions, suspended for the season. The defendant then removed its gas buoy light and stored it on the United States government pier in the Cleveland harbor. Maj. P. S. Bond, the government engineer in charge of this work, established, upon the removal of the gas buoy, a light on the east end of the breakwater. An upright pole with a cross-arm was erected, with devices to raise and lower the light. Thereafter, and until the lake was frozen over, and again as soon as the ice disappeared in the spring, the engineer, and subordinate employés under his direction and control, maintained and took care of this light.

The evidence tends to show that on the afternoon of May, 9, 1915, at about 3 o'clock, these employés filled the lamp, lighted it, and placed it in position; but, in our opinion, there was sufficient evidence to go to a jury tending to show that during the night, and preceding the time of the accident, it was not lighted or burning.

[1] No question seems to be made by counsel for defendant that if, on these facts, a duty rested on defendant to maintain this light after the acceptance by the engineer in charge of the east 1,800 feet of the breakwater, the issues should have been submitted to the jury. This is also our opinion. The lake at this point was used more or less by all kinds of craft plying to points east of Cleveland to enter and leave the harbor. This use of the lake at this point was known to the engineer in charge and to the defendant and its servants. A legal duty, according to well-settled principles of law and numerous cases, was thereby imposed upon any one constructing an obstacle in water thus used to exercise reasonable care for the safety of all persons making use of the harbor, and this duty obviously required the placing and maintaining of a suitable warning light. Casement v. Brown, 148 U. S. 615, 623, 13 Sup. Ct. 672, 37 L. Ed. 582; Harrison v. Hughes (D. C.) 110 Fed. 545, approved and affirmed on appeal (3 C. C. A.) 125 Fed. 860, 60 C. C. A. 442; Wright & Cobb Lighterage Co. v. Snare & Triest Co. (3 C. C. A.) 239 Fed. 482, 152 C. C. A. 360. Defendant, however, contends, and the court below held, that after the completion and acceptance by the engineer in charge of the east 1,800 feet no further duty or obligation rested upon it to guard or protect that end by a warning light, but that all duty in that behalf became thereafter the obligation of the owner, and that in point of fact

the owner, through its proper officer, assumed this obligation and undertook to perform it.

[2] The general rule of law, subject to certain exceptions not now material to note, is that, after the contractor has turned over the work and it has been accepted by the owner, the contractor incurs no further liability to third persons by reason of the condition of the work, but the responsibility for maintaining it and protecting third persons against danger therefrom, or the use of it in a defective condition, or failing to give notice or warning of dangers to be apprehended from its existence, is then shifted to the owner. This rule of law does not seem to be disputed; in fact, counsel for both parties cite and rely in part on the same cases. See Salliotte v. King Bridge Co. (6 C. C. A.) 122 Fed. 378, 381, 58 C. C. A. 466, 65 L. R. A. 620, writ of certiorari denied 191 U. S. 569, 24 Sup. Ct. 841, 48 L. Ed. 306; Thornton v. Dow, 60 Wash. 622, 111 Pac. 899, 32 L. R. A. (N. S.) 968, and note; Philadelphia, etc., Railroad Co. v. Philadelphia, etc., Towboat Co., 23 How. 209, 16 L. Ed. 433; Richards v. O'Brien, 1 Ga. App. 111, 57 S. E. 907; Erie & Western Transportation Co. v. City of Chicago, 178 Fed. 42, 101 C. C. A. 170.

[3] The considerations relied on by plaintiff to take the present case without this general rule are, as we understand them, that the defendant's construction contract is an entire contract; that the obligation required thereby and also by the general rules of negligence law to maintain signals and lights, such as were required or necessary in the interest of the safety of third persons, continued until the contract was performed in its entirety; that the work had not been fully completed, turned over, and accepted; and that the completion and acceptance of the east 1,800 feet only, even if authorized, did not bring defendant within the protection of the general rule above stated. These contentions are supported by invoking the general rules of law as to what is an entire contract, and certain provisions of this contract, the most material of which are cited in the margin.[1]

---

[1] 17. *Payments.* Payments will be made monthly on estimates of such stone as has been placed in the work in accordance with the specifications and not included in any prior estimate, except that ten (10) per cent. of the amount of each estimate will be retained until the contract work is fifty (50) per cent. completed, after which the amount of reserve will remain unchanged until the full completion of the contract.

22. *Changes.* No changes in the character of the material or workmanship herein described will be permitted, unless specially authorized by the engineer. Should it be found desirable to materially modify or change the plans or designs of the work, such modification or changes must be embodied in a supplementary contract with the consent of bondsmen, and must receive the approval of the Secretary of War, before becoming effective.

29. *Order of Work.* The work will be divided into sections 1,000 feet in length. These sections will be constructed in order from west to east, as far as the funds provided will fully complete. Work will not be permitted in more than two sections in advance of the completed superstructure, except by special permission of the engineer.

30. *Acceptance and Responsibility.* The contractor will be held responsible for and required to maintain and repair the work until it has been accepted by the engineer in writing. Such acceptance will be made by the engineer on the written request of the contractor, as follows: Each length of 100 feet

We have examined these provisions and have duly weighed the considerations urged upon us. The change in the order of constructing the sections is, in our opinion, within the authority of the engineer and permitted by the terms of the contract. The engineer in charge is by the contract itself defined to be the contracting officer. He is expressly authorized to make such minor changes in execution of the work to be done as in his judgment may be necessary or expedient to carry out the intent of the contract, provided that the unit cost is not thereby increased. The modifications or changes which he may not make, without a supplementary contract consented to by the contractor's bondsmen and approved by the Secretary of War, are such as materially modify or change the plans or designs or increase the unit cost of the work. A change in the order in which the sections were to be constructed is not a change of the plans or designs and does not increase the unit cost. It is, on the contrary, a minor change in the execution of the work to be done under the specifications. The change was, in the judgment of the contracting officer, expedient in order to lessen the danger of an unfinished obstacle to navigation below the surface of the water at the east end of the breakwater.

An acceptance by him of a part of the work, when completed according to the requirements of the contract and to his satisfaction, is also expressly authorized and is not outside of his authority. Each completed length of 100 feet may be accepted. The severance of such

continuously from the western end, when the same has been completed as herein provided and to his entire satisfaction.

The contractor will be required to maintain at his own expense, the lights and signals required by the regulations of the United States Lighthouse Board, or by the engineer.

35. *Minor Modifications.* The right is reserved to make such minor changes in the execution of the work to be done under these specifications as, in the judgment of the contracting officer, may be necessary or expedient to carry out the intent of the contract: Provided, that the unit cost to the contractor of doing the work shall not be increased thereby, and no increase in unit price over the contract rate shall be paid to the contractor on account of such changes. No change which will materially affect the cost of doing the work will be made and no greater or lesser unit price than the contract rate will be paid, except upon formal written agreement between the parties, approved by the Chief of Engineers and the Secretary of War, as provided in the form of contract to be entered into.

7. If at any time during the prosecution of the work, it be found advantageous or necessary to make any change or modification in the project, and this change or modification shall involve such change in the specifications as to character and quantity, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change, and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War: Provided, that no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligation arising from such modification was incurred.

10. Until final inspection and acceptance of, and payment for, all of the material and work herein provided for, no prior inspection, payment, or act is to be construed as a waiver of the right of the contracting officer to reject any defective work or material or to require the fulfillment of any of the terms of the contract.

an accepted portion is thus duly authorized, regardless of whether the contract itself is entire or divisible. The force and effect of this acceptance is not, in our opinion, controlled or modified by the reservation of a part of the contract price or the right reserved thereafter and prior to full completion and payment to reject defective work or material, or to require the fulfilling of any of the terms of the contract. This view of the terms of the contract makes unnecessary any discussion of the cases relating to the power and authority of the engineer to change or waive the provisions of a contract. This acceptance was accompanied by a taking of possession of the east 1,800 feet, so far as possession can be taken of such a structure. This possession was accompanied by the assumption thereafter by the engineer in charge of the owner's duty and obligation of constructing and maintaining a warning light. Nothing thereafter remained to be done by the contractor on this east 1,800 feet, and, in point of fact, it thereafter neither did nor was required to do anything. The contractor did not thereafter fail to comply with any requirement of the engineer for maintaining a warning light.

The duty imposed by this contract to maintain a warning light is no greater than the common-law duty. It becomes unnecessary, therefore, to consider whether or not provisions in a construction contract for the safety of third persons are available to them as supporting an action based on negligence. For discussion of this proposition see the following: Consolidated Coal Co. v. Knickerbocker Co. (D. C.) 200 Fed. 840; Harrison v. Hughes (D. C.) 110 Fed. 545, affirmed 125 Fed. 860; Styles v. F. R. Long Co., 67 N. J. Law, 413, 51 Atl. 710, on second appeal 70 N. J. Law, 301, 57 Atl. 448; Williams v. Stillwell, 88 Ala. 333, 6 South. 914; Earl v. Lubbock [1905] 1 K. B. 253. The final solution of the question involved turns, in our opinion, on whether or not the contractor had fully performed his contract as to the east 1,800 feet, and whether or not it had been turned over to and accepted by the owner and possession and control thereof taken by the owner. All this had been done, and, in our opinion, with proper authority and without violating any provision to the contrary.

[4] Two other considerations are urged by plaintiff which call for brief comment. Three witnesses testify that after the accident they called on Maj. P. S. Bond, the engineer in charge, and that he stated to them that the government was maintaining a light at the east end of the breakwater for the accommodation of the defendant. Maj. Bond denies having said that the light was maintained for the accommodation of the defendant and testifies that in point of fact, this east end had been accepted and taken over, and that the light was being maintained by him or his employés on behalf of the government. Inasmuch as Maj. Bond was not, when making this statement, an agent or officer of the defendant, this evidence was admissible only for the purpose of impeaching his testimony and goes only to its weight. Even if it should be regarded as so weakening his testimony as to justify entirely disregarding it, there still remains the supporting testimony of two witnesses to the same effect and none in conflict with it. When defendant resumed construction work on the other sections

about May 21, 1915, 12 days after the accident, this gas buoy light was, at the request of Maj. Bond, towed by the defendant from the government pier to the east end of the breakwater and anchored there. During this time the government was constructing a pier for a harbor light at that point. It remained in this position until a date some time later than the final completion and acceptance of the remainder of the breakwater. Maj. Bond says that the gas buoy light while there was maintained by the defendant, whereas defendant's witnesses say that it was placed there as a loan to the government at the request of Maj. Bond, who offered to pay the expense. This buoy, when once charged with gas, burns for a period of some 300 days at an estimated expense of 15 cents a day. We do not find in these statements anything which modifies or controls the conclusion already expressed. Even if the jury would have been warranted in drawing the inference that the gas buoy was replaced because required by the engineer under the authority of the contract, this would not control the status existing after the original acceptance and taking possession and control, which continued up to and until after the accident.

The judgment of the lower court is affirmed.