## THE ZELLER NO. 12.

## ZELLER MARINE CORPORATION v. NESSA CORPORATION.

District Court, S. D. New York.

Nov. 15, 1946.

Purdy & Lamb, of New York City, for libellant.

Bigham, Englar, Jones & Houston, of New York City, for respondent.

RIFKIND, District Judge.

Libellant moves to overrule the exceptions filed by the respondent to the report of a special commissioner appointed to assess damages, and for a confirmation of the report. The assessment of damages was referred by an interlocutory decree, entered on consent, which provided that libellant recover from respondent the provable damages to the extent of 90% thereof, without interest or costs to the date of the entry of the interlocutory decree.

On November 20, 1941, a cargo of steel girders was unloaded from libellant's scow by respondent. During the operation some of the girders were allowed to fall, penetrating the deck of the scow and striking against the top of one of the fore and aft keilsons in the bottom of the scow. The keilson was made of long leaf yellow pine timber, 12 by 12 inches. The injured section was 39 feet long. The scow was 14 years old and, prior to the incident, was in good condition.

The damage to the keilson caused by the blow consisted of a V-shaped depression in its top, the length of each arm of the V being about 3 inches. The fibers of the wood within this area were crushed to a depth of 1½ inches according to libellant's witness, and ½ inch according to respondent's witness. The depth of the crushed area hereinabove mentioned was the maximum depth, that is, the depth found at the nadir of the V depression, and decreased from that point to the end.

A split was found on the top of the keilson running fore and aft for a distance of 28 inches. Another split was found on the port side of the keilson which was about 20⅝ inches. According to libellant's witness, the split was 6 inches into the keilson at its deepest point. According to respondent's witness, he was able to probe the split for only one quarter of an inch, using a small screw-driver having a blade ⅟₁₆th of an inch thick.

Although this damage was sustained in November, 1941, it was conceded that to the time of the hearing in April, 1944, no repairs had been made to the keilson, and the scow worked steadily and continued doing the same type of work as it had done theretofore.

During the hearing the libellant took the position, which was sustained by the special commissioner, that under the rule of restitutio in integrum, the libellant was entitled to have the scow put back to its original condition, irrespective of the cost of removing and renewing the damaged keilson. It was the contention of the respondent that, where the cost of renewal was disproportionate to the cost of repairing the damage and putting the scow into as good a condition as it was before the injury, libellant was only entitled to the reasonable cost of such repair, together with the depreciation, if any, of the scow which had been damaged and repaired. Upon these two different theories each of the parties to the controversy proceeded in the presentation of evidence. There was no question but that libellant was entitled to a renewal of three broken deck planks which had been penetrated or broken.

On behalf of libellant, one of the experts, Swenson, testified concerning the repairs necessary to restore the scow to its original condition, which he estimated at $6,555, including $138 for renewing three deck planks. Most of the cost was represented by the expense of removing certain uninjured parts of the scow in order to permit the renewal of the keilsons. The actual cost of a new keilson was $370. The witness admitted that the scow could be repaired without renewing the keilson and be restored to a seaworthy condition. He also conceded that there would be no difference in structural strength between a properly repaired keilson and a renewed one. Even without any repairs being made, the structural strength of the scow was not materially impaired by the two splits. In fact, if the witness were the owner of the scow, he would not replace the injured member. It required "a lot of removals for a small damage. Yes, $4,000.00 worth of bottom plank removals for small damage."

Libellant's foreman, Sando, testified that a renewal of the keilson was necessary, because otherwise the scow was unsafe. As it appears in the transcript, his testimony does not seem impressive.

Another expert, Bagger, was called in rebuttal by libellant. He testified that the physical strength of the keilson was materially affected by the injury, although it was impossible to estimate it in percentages. The only proper way to repair the damage was to renew the keilson, despite the fact that it admittedly entailed a considerable expense for one member. He was of the opinion that the split, if not repaired, would become more extensive only if the scow were loaded more heavily than ordinarily.

Two experts were called by respondent.

One of them, DeMars, did not see the damage. In answer to a hypothetical question, he was of the opinion that the damage, even if not repaired, did not weaken the keilson or reduce the serviceability of the scow. In fact, it was not necessary to make any repairs in order to restore the vessel to its previous condition, except, perhaps, "to close up the slight fracture that has been testified to here with a couple of galvanized nails." The extent of the damage was so minute that there was no justification for a renewal of the keilson at an expenditure of $6,500 or even $4,000, when the market value of the scow before the damage was, in his opinion, $14,000, assuming the deck planks were in good condition. If not, a new deck costs $6,000, and its life is about 12 years.

The other witness for respondent, Horn, testified that the splits did not detract from the structural strength of the scow, nor did they affect its seaworthiness or cargo-carrying ability. It was just as good and strong a vessel now as it had been. To renew the keilson would be too expensive and not practicable. Such a job would require the removal of 37 bottom planks out of a total of 96. The reasonable value of the work required to renew the keilson, doing all the work that libellant contended for, was $4,800 instead of libellant's figure of $6,555. Even if the keilson should have to be renewed, 7 less planks than libellant claimed would have to be removed. The reasonable value of such work, according to this witness, was $4,100.

Although the damage was as slight as it was, nevertheless, Horn testified that, to an owner who was very squeamish, he would recommend repairing the keilson by putting a sister piece alongside the damage, about 6 inches wide and 12 inches high, extending from the forward end of the keilson to the after end behind the split. This work could be done by removing only 4 bottom planks. The cost of so reinforcing the keilson and removing the bottom planks would be $580. Thus, reinforced, the scow would be as strong, seaworthy and serviceable as before the damage occurred. As for replacing the 3 deck planks, the reasonable cost was $92.

The special commissioner accepted the testimony of the libellant's witnesses and reported that libellant's damage was $6,500 of which it was entitled to recover 90%, or $5,899.50.

Admiralty Rule 43½, 28 U.S.C.A. following section 723, provides:

"In all references to commissioners * * * the report of the commissioners * * * shall be treated as presumptively correct, but shall be subject to review by the court, and the court may adopt the same, or may modify or reject the same in whole or in part when the court in the exercise of its judgment is fully satisfied that error has been committed * * *."

 The Baltimore, 1869, 75 U.S. 377, 8 Wall. 377, 19 L.Ed. 463, is frequently cited as the leading case establishing the rule of damages in tort cases in admiralty where a vessel has been damaged. There the court said 8 Wall. at page 385, 19 L.Ed. 463:

"Restitutio in integrum is the leading maxim in such cases, and where repairs are practicable the general rule followed by the admiralty courts in such cases is that the damages assessed against the respondent shall be sufficient to restore the injured vessel to the condition in which she was at the time the collision occurred; * * *."

The court continued, 8 Wall. at page 386, 19 L.Ed. 463:

"Restitution or compensation is the rule in all cases where repairs are practicable, but if the vessel of the libellants is totally lost, the rule of damage is the market value of the vessel (if the vessel is of a class which has such value) at the time of her destruction."

 In this case we are confronted by the question of the meaning of the term "practicable" as used in the rule laid down by the Supreme Court. One definition which seems appropriate is "being of practical value or advantage; desirable"; Funk & Wagnall's New Standard Dictionary, 1941. In the case at bar, it would be hardly of practical advantage or desirable to renew the keilson at so great and disproportionate an expense, when the injured member can be repaired at a much smaller cost and with a result that will leave the scow in as good a condition as it was before. It seems unreasonable to read

the Supreme Court's definition as if it meant to include everything that was not impossible. Similarly, to read the words, "restore the injured vessel to the condition in which she was" as if it meant restore to the identical condition, rather than restore to as good a condition, seems to me to be unreasonable. A construction of the Supreme Court's rule in the former manner attributes some virtue to a mechanical system of justice over a rational desire to make the libellant whole. The disparity between the extent of the damage and the cost of complete restitution reveals in all its exaggerated form the irrationality of a literal application of the maxim to the instant case. Prior to the injury the condition of the scow was such that she was strong, staunch and serviceable. If she is restored to that very same condition by repairing the keilson rather than replacing it, libellant has been fully compensated, especially if allowance is made for any depreciation in value after the repair is effected. The phrase "restitutio in integrum" should not be used as a mystic formula, but rather as an instrument of doing justice, that is, of providing full compensation or indemnity for the loss suffered by the innocent party. The Baltimore, supra, 8 Wall. at page 385, 19 L.Ed. 463; 15 C.J.S., Collision, §§ 175, 194, pp. 206, 219.

■ It is sufficient if, by repair, libellant's vessel is restored substantially to the same condition as she was in before without renewal of the keilson. Streckfus Steamboat Line v. United States, 5 Cir., 1928, 27 F.2d 251, 252; Socony No. 21, S.D., N.Y.1933, 1934 A.M.C. 136. As was suggested by the special commissioner in the Socony case, supra, whose report was confirmed, "a blind adherence to the doctrine of restitutio in integrum may easily lead to an absurd result." Such an absurd result would unquestionably be achieved in the instant case.

■ Libellant is entitled to be "reasonably but fully compensated," and to no more. Pennsylvania R. Co. v. Downer Towing Corp., 2 Cir., 1926, 11 F.2d 466, 467. Damages may be awarded on satisfactory evidence of the "cost of reasonable and proper repairs, even though these repairs have not been, and may even never be made." Theothilatos v. Martin Marine Transp. Co., 4 Cir., 1942, 127 F.2d 1016, 1019. The object is to make the libellant whole, allowing him full compensation for pecuniary loss sustained. 25 C.J.S., Damages, § 71, p. 560; The Agwidale, S.D., N.Y., 1945, 61 F.Supp. 191, 199, affirmed Agwilines, Inc., v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869, certiorari denied Agwilines, Inc. v. The San Veronico, 66 S.Ct. 980.

■ If the repair will make the scow as seaworthy and serviceable as before the injury, without dismembering a substantial part of the vessel at greatly increased cost, the libellant has no cause for complaint. The Loch Trool, N.D., Cal., 1907, 150 F, 429, 431; The J. T. Easton, S.D., N.Y., 1885, 24 F. 95; The Downer, E.D., N.Y., 1921, 274 F. 220; Streckfus Steamboat Line v. United States, 5 Cir., 1928, 27 F.2d 251, 252.

Some question has arisen of the usefulness of the phrase restitutio in integrum in admiralty. The phrase was derived from the Roman civil law to denote "a restoring parties to the condition they were in before entering into a contract or agreement, on account of fraud, infancy, force, honest mistake, etc." 2 Bouv.Law Dict., Third Revision, p. 1914. There is, therefore, no connection between the use of this phrase in Roman law and in modern maritime law. It appears to have been transferred merely because it was thought to convey in a convenient and terse form the idea of the admiralty that the innocent party should be reimbursed for his actual pecuniary loss. Roscoe, The Measure of Damages in Actions of Maritime Collisions, 3d Ed., 1929, pages 5–7, 74.

Unfortunately, however, the phrase does not accurately express the court's intentions to assess damages on well defined principles of awarding the injured party a just indemnity for the wrong. The repetitious use of the phrase obscures the real nature of damages, which is pecuniary compensation for an injury received, and not necessarily a replacement of the injured person in status quo ante. Cf. Sedgwick on Damages, 9th Ed., 1913, Sec. 30, n. 81.

The suggestion was made in Admiralty Commissioners v. S. S. Valeria, House of Lords, (1922) 2 A.C. 242, that the future use of the phrase be dispensed with. It was said, in a concurring opinion, at page 248:

"I agree with the Lords Justices in the Court of Appeal, but I cannot refrain from a slight criticism upon the use of the phrase 'restitutio in integrum'. 'Restitutio in integrum' is a phrase which is properly applied when you wish to express the condition which is imposed upon a person seeking to rescind a contract. I do not think it can be properly applied to questions of tort; * * *"

From the evidence, I conclude that the scow's keilson can be repaired, without a renewal of that member, so that the scow will be as seaworthy and as serviceable as it was before the injury, and that the reasonable cost of such repairs is $580.

Cases cited by libellant do not sustain its position. In Nassau Sand & Gravel Co., Inc., v. Red Star Towing & Transp. Co., Inc., 2 Cir., 1932, 62 F.2d 356, modifying, D.C., 52 F.2d 704, completely broken keilsons were involved. The court found that splices on the keilsons would not make the barge as good as she was. This is unlike the case at bar.

In The Ames & Carroll No. 20, 2 Cir., 1933, 66 F.2d 413, it was not disputed that the broken planks had to be replaced. The only question was as to the method to be employed in replacing them. The court stated (66 F.2d at page 414) that the owner of the scow was entitled to have the scow restored "to as good condition as before the collision."

In The B. F. Guinan, E.D., N.Y.,1930, 40 F.2d 277, it was not disputed that certain planks had to be removed in order to make permanent repairs. The court held that since the planks, when removed, might become unfit to be put back, the cost of replacing such planks should be on the wrongdoer. The court also found that the cost of the permanent repairs was not out of proportion to the value of the boat.

Libellant is entitled to recover not only the reasonable cost of repair which would restore the scow to as good a condition as it was before the damage, but also a due allowance for any difference between the original value of the scow and its value after repairs. There was no claim of any loss of use of the scow in this case. Restatement, Torts, Sec. 928.

On the question of value, the only testimony offered by libellant was that of Bagger, who stated that the damage did affect the market value of the scow, without indicating to what extent. There was no testimony by this expert whether the damage, after being repaired as contended for by libellant or as contended for by respondent, would lessen the value of the scow. Respondent's expert, De Mars, testified that if the scow were repaired in the manner suggested by Horn, the soundness, seaworthiness and ability to carry cargo would not be impaired. He also stated that a scow which has a patch on a structural member which prevents an examination of the condition that necessitated the repair, does suffer depreciation in value, but that he knew of no standard of determining that amount of depreciation. In such state of the evidence, there can be no recovery for depreciation. It was expressly so held in The Loch Trool, N.D., Cal.,1907, 150 F. 429, 433, citing with approval Sawyer v. Oakman, 7 Blatchf. 290, Fed.Cas. No. 12,-402.

In view of the fact that I am "fully satisfied that error has been committed," Admiralty Rule 43½ requires that the court "reject" the report of the special commissioner. The exceptions to the report are sustained. Submit a decree, on notice, awarding to libellant the sum of $646.20, representing 90% of $718, which includes $138 for renewing 3 deck planks, and $580 for repairing the damaged keilson.