**BULTEMA DOCK & DREDGE COMPANY, Libelant,**

v.

**STEAMSHIP DAVID P. THOMPSON, her engines, boilers, etc., and American Steamship Company, Respondent.**

Civ. A. No. 4466.

United States District Court
W. D. Michigan, S. D.

April 4, 1966.

Hathaway, Latimer, Clink & Robb, Muskegon, Mich., H. Winston Hathaway, Muskegon, Mich., of counsel, for libelant.

Coffey, Heffernan & Harrison, Buffalo, N. Y., Warner, Norcross & Judd, Grand Rapids, Mich., Fenton F. Harrison, Buffalo, N. Y., Leonard D. Verdier, Jr., Grand Rapids, Mich., of counsel, for respondent.

FOX, District Judge.

This is an action by libelant to recover for damages resulting when respondent steamship collided with an underwater construction project maintained by libelant at a power plant dock on Lake Macatawa, Holland, Michigan.

Jurisdiction is founded on 28 U.S.C. § 1333, and the action is brought pursuant to the Admiralty Jurisdiction Extension Act, being 48 U.S.C. § 740.

By contract dated January 17, 1962, libelant undertook to construct a 360 foot extension of the power plant dock, to extend southwesterly of the existing structure. The contract states, under heading "GC 29 Laws and Ordinances:

The contractor shall at all times observe and comply with all ordinances, laws and regulations * * *.

All permits and licenses required in the prosecution of any and all parts of the work shall be obtained and paid for by the contractor."

The Federal permit obtained by the City of Holland for the project states:

(h) That if the display of lights and signals on any work hereby authorized is not otherwise provided for by law, such lights and signals as may be prescribed by the U. S. Coast Guard, shall be installed and maintained by and at the expense of the owner.

(i) That the permittee shall notify the said district engineer at what time the work will be commenced, and as far in advance of the time of commencement as the said district engineer may specify, and shall also notify him promptly, in writing, of the commencement of work, suspension of work, if for a period of more than one week, resumption of work, and its completion.

(The engineer referred to in (i) is the District Engineer, U. S. Army Corps of Engineers.)

The purpose of this written notice is to enable the Corps of Engineers to issue special advisory bulletins to navigation interests, or to notify the U. S. Coast Guard, which in turn places the information in Notices to Mariners. Both of these publications are regularly issued, containing notice of obstructions, work projects, and other such matters which are of importance to maritime navigation.

The District Engineer was never notified of this project, and no notice of the project appeared in either special advisory bulletins of the Corps of Engineers, or the Notices to Mariners of the U. S. Coast Guard prior to the date of this accident.

Construction of the project began in the spring of 1962.

Respondent, the Steamship David P. Thompson, delivered cargoes of coal to the power plant dock on May 28, June 26, and August 3, 1962. The ship's master on June 26 and August 3 was Captain Albert Guddeck, now deceased. The

second mate on board the Thompson was with her on all three occasions.

On June 26, sheet steel piling had been installed the length of the project, and extended out of the surface of the water, away from shore, to a height of about three feet along its entire distance. On both this occasion and May 28, the Thompson arrived and departed during daylight hours.

By August 3, the wall was submerged, and wooden stakes, two by fours, were placed along the wall to mark joints and to mark the project itself. These stakes projected out of the water, two to five feet, and marked the line of the project.

At all times there was construction equipment about, including a 93 by 32 foot barge carrying a 40-ton crawler crane. On the night in question, this barge was moored about half way down the uncompleted project, with lights placed at its outboard corners.

On the night of August 3, the ship arrived at the dock at about 10:00 P.M. and finished unloading at 1:20 A.M., August 4. Because of the presence of the barge, the stern of the Thompson projected outward into Lake Macatawa at a slight angle, since the stern overlapped the barge to some extent.

The turning basin in Lake Macatawa is diamond shaped, and as the Thompson backed away from the dock and into the turning basin, the wind, together with the tendency of a single screw vessel like the Thompson to back to port, carried her north and west, out of the limits of the turning basin. The Thompson's seacocks began to clog with mud, and the only alternative available to the master was to bring the Thompson toward the shore below the existing dock, preparatory to winding the vessel, that is, once again turning the stern down into the turning basin by first running the stem of the ship into the muddy shore, working around with engine and rudder until the stern once again was directed into the good water of the turning basin, and then backing out until able to come about.

This maneuver was effected twice, and the Thompson then successfully proceeded down the channel into Lake Michigan.

However, on the first occasion the bow stopped some distance from the shoreline and the lookout, the second mate, heard a crunching noise which he thought to be a submerged clump of pilings. For the first time he noticed libelant's row of stakes protruding from the water.

The next morning libelant's workmen discovered extensive damage to the construction, and this suit to recover damages is the result.

It is the claim of libelant that the Thompson was negligent in so backing and turning as to strike libelant's dock extension facility.

It is the claim of the respondent that the Thompson was not guilty of any negligence, and that libelant was in fact negligent in failing to properly mark the project and in stationing its barge in such a way as to force the Thompson to execute the backing and turning maneuver which led to the collision.

 It is undisputed that the waters of Lake Macatawa are navigable waters of the United States. The right to navigate over such waters extends from shoreline to shoreline. Pioneer Steamship Co. v. United States, 176 F.Supp. 140 (D.C.E.D.Wis.1959).

As to liability, the court is presented with a factual determination, and after a consideration of the record and briefs, finds negligence on the part of both libelant and respondent.

" 'Negligence' at sea does not differ, in principle, from 'negligence' ashore. It is an elastic and open-textured concept, defined as the correlative of the equally vague standard of 'due care;' 'good' or 'prudent' seamanship sometimes appears as a synonym." Gilmore and Black, The Law of Admiralty, p. 420 (1957).

 Libelant avers that the presence of the barge, with lights on the outboard corners, sufficiently indicated the presence of the project to establish neg-

ligence on the part of the Thompson in striking the construction. The simple answer to this is that the lights on the barge could as easily have been intended for the barge's identification, and the location of the barge, if at all connected with an underwater construction project, could have been taken as the limits of the construction.

Respondent alleges that the location of the barge in itself caused the master of the Thompson to resort to the manner of turning which he did, and when the seacocks began to clog in the shallow water, he was presented with a maritime emergency.

Although the mooring of the barge in this position may not have been the most expedient thing to do, in view of the rather explicit testimony of respondent's expert, Captain Booth, that he would have had the barge moved before leaving the dock, and in view of the doctrine of discovered negligence, as applied in Ford Motor Co. v. Bradley Transp. Co., 74 F.Supp. 460 (D.C.E.D.Mich.1947), aff'd 174 F.2d 192 (CCA 6, 1949), it is doubtful that the actions of the Thompson's master could be considered in the context of negligent location of the barge.

However that may be, it is not necessary for the court to consider those claims in establishing the negligence of respondent. The Thompson's second mate was on board the Thompson on each of the two previous occasions when she docked at the municipal power plant and on each occasion he saw the construction equipment, building materials and construction in progress. He was the bow lookout of the Thompson as she left the dock on the morning of August 4. The barge with crane aboard, together with other construction equipment, was still on the scene.

The court finds that under all the circumstances of this case, the failure to alert the Thompson's master of the construction, whether the result of unintentional forgetfulness, or mistaken belief, was negligence, and the Thompson is charged with this negligence. The failure of a lookout to alert the master

of hazards is negligence imputable to the vessel. Cuba Distilling Co. v. Grace Line, Inc., 143 F.2d 499 (CCA 2, 1944). See Lamb v. Interstate S.S. Co., 149 F.2d 914 (CCA 6, 1945).

As to libelant's negligence, there was a clear duty to adequately mark the construction site. This duty was breached in the instant case.

Title 33 of the Code of Federal Regulations, § 66.01–35, Marking of Structures, requires such lights and signals as may be prescribed by the Commandant, U. S. Coast Guard:

"* * * The prescribed lights and signals shall be installed, maintained and operated by and at the expense of the owner, or operator, who shall after obtaining a Corps of Engineers' permit authorizing construction of the structure, apply to the District Commander having jurisdiction over the waters in which the work will be executed for determination of the lights and other signals to be displayed. This requirement includes the temporary lights and signals to be displayed during the construction of such structure. Regulations prescribing the lights or other signals required to mark any work or obstruction may or may not be published. If no regulation exists, each case shall be considered individually by the District Commander, who will prescribe such lights and signals as he may consider necessary for the safety of navigation." Ibid.

The only marking of the construction project was the line of stakes at 14-foot intervals, with no lights, signals or even reflecting tape.

It is a rule of admiralty law that when the fault consists in the breach of a statutory rule intended to prevent collisions, the burden is on the wrongdoing party to show that the accident could not have resulted from this negligence. The Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); Merritt-Chapman & Scott Corp. v. Cor-

nell Steamship Co., 265 F.2d 537 (CCA 2, 1959).

■ It is evident that the rule here involved is designed for the prevention of collisions, since it is necessary for the protection and safety of navigation. Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582 (1893); Williams v. Edward Gillen Dock, Dredge & Construction Co., 258 F. 591 (CCA 6, 1919); 33 C.F.R. § 66.01–35, supra.

It is impossible for the court to say, under the facts before it in this case, that if the project had been properly marked and the lights or signals visible, the Thompson would nonetheless have collided with the underwater construction. Captain Booth testified unequivocally that if the stakes had been visible the Thompson could, by using another method, have achieved the same purpose without ramming the shore.

Therefore, the court finds both parties guilty of negligence.

■ It is an established rule of admiralty that contributory negligence does not bar recovery. In the Sixth Circuit, the rule of comparative negligence is followed; that is, contributory negligence acts only in mitigation of damages. The Seeandbee, 102 F.2d 577 (1939); King v. Testerman, 214 F.Supp. 335 (D.C.E.D.Tenn.1963). Another practice is to divide the damages equally when both parties are at fault. See, e. g., W. E. Hedger Transp. Corp. v. United Fruit Co., 198 F.2d 376 (CCA 2, 1952), cert. den. 344 U.S. 896, 73 S.Ct. 275, 97 L.Ed. 692 (1952); Merritt-Chapman & Scott Corp. v. Cornell Steamship Co., supra.

■ In this case the court finds no greater fault on the part of one party than the other, and the result is a division.

■ As to the amount of damages, libelant is including its normal profit and overhead charges in the amount charged for the reconstruction. Respondent disputes this, asserting that in admiralty damages are limited to pecuniary losses, citing, among other cases, Standard Oil Co. of New Jersey v. South-

ern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925), and The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897).

After reviewing a number of the cases in this area, the court concludes that the rule contended for by respondent is inapplicable.

Lost profits are recoverable for the detention of a commercial vessel. The Agwidale, 61 F.Supp. 191 (D.C.S.D.N.Y. 1945), aff'd Agwilines, Inc. v. Eagle Oil & Shipping Co., 153 F.2d 869 (CCA 2, 1946), cert. den. Agwilines, Inc. v. The San Veronico, 328 U.S. 835, 66 S.Ct. 980, 90 L.Ed. 1611 (1946). And in Nicodemisen v. O/S/F/V Dartmouth, 157 F.Supp. 339 (D.C.D.Mass.1957), lost profits were awarded for the detention of a fishing vessel.

In the case of Ford Motor Co. v. Bradley Transp. Co., supra, overhead costs were allowed on repairs and demolition of a damaged dock.

The governing principle was well stated in The Zeller No. 12, 68 F.Supp. 795 (D.C.S.D.N.Y.1946), aff'd 166 F.2d 32 (CCA 2, 1948):

"Libellant is entitled to be 'reasonably but fully compensated,' and to no more. Pennsylvania R. Co. v. Downer Towing Corp., 2 Cir., 1926, 11 F.2d 466, 467. Damages may be awarded on satisfactory evidence of the 'cost of reasonable and proper repairs, even though these repairs have not been, and may even never be made.' Theothilatos v. Martin Marine Transp. Co., 4 Cir., 1942, 127 F.2d 1016, 1019." Id., 68 F.Supp. at 799.

In discussing the admiralty ideas urged by the respondent that the injured party is entitled to compensation only for actual pecuniary loss, *restitutio in integrum*, the court said:

"Unfortunately, however, the phrase does not accurately express the court's intentions to assess damages on well defined principles of awarding the injured party a just indemnity for the wrong. The repetitious use of the phrase obscures the real nature of

damages, which is pecuniary compensation for an injury received, and not necessarily a replacement of the injured person in status quo ante. Cf. Sedgwick on Damages, 9th Ed., 1913, Sec. 30, n. 81." (Ibid.)

Therefore, in this case, libelant is entitled to more than simply a return to the status quo. It has been established that the profit and overhead charges meet with the practice in the marine construction field. Had it been necessary for an outside company to repair the damage, the cost of such repairs would include similar charges. There is no reason to free respondent of these costs simply because the injured party is in a position to make the repairs itself. The court finds that libelant is entitled to include profit and overhead in its statement of damages.

As to the actual amount of damages, the parties have agreed on labor and material costs. Labor, including overhead and profit, amounted to $2,589.95. Material costs were $708.93.

There was a dispute between the parties as to the rental rates for various pieces of equipment, and also as to the actual time necessary to complete the job. Completion of repairs took 11.5 days, but respondent's expert concluded the work could have been completed in 9.2 days had a full work crew been kept on the job (libelant's job foreman admitted the full crew "would have helped") and had certain other measures been taken.

The court agrees that the full complement of men would have speeded the repairs somewhat, but notes that the remainder did work overtime. In regard to the other measures, chiefly the rental of an additional welding machine, the court under the circumstances is not in agreement with respondent's contention that libelant did not take proper steps to mitigate its damages, and concludes that 11.5 days is the proper figure to use in computing rental costs.

However, insofar as rental rates are concerned, the court was presented with significantly divergent views of reasonable rental rates by the respective experts. Under the circumstances the court will halve the difference between the disputed rates.

Also, where weekly rates apply, the court has used them, since it was known that the work would take longer than two weeks. (Respondent's Ex. C.)

The total value of rental equipment, including overhead and profit, is then $10,039.75.

Material, with overhead and profit, comes to $886.17.

Labor as stipulated, is $2,589.95.

The superintendence claim was withdrawn by stipulation, and respondent is entitled to $50 credit for scrap on the damaged material.

The total damages amount to $13,465.87. Respondent is therefore found liable for $6,732.94.